# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUSTEN SCOTT DOWLING<br>33 Deer Hill Road<br>Lebanon, NJ 08833<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ZAHAV BIOSCIENCE, LLC<br>150 N. Radnor Chester Road, Suite F100<br>Radnor, PA 19087<br>　　and<br>BRODIE GENERATIONAL CAPITAL<br>PARTNERS, LLC<br>150 N. Radnor Chester Road, Suite F100<br>Radnor, PA 19087<br><br>　　　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | CIVIL ACTION<br><br>NO.: _____<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Justen Scott Dowling (hereinafter referred to as "Plaintiff," unless indicated otherwise) by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.　Plaintiff has initiated this action to redress violations by Zahav Bioscience, LLC and Brodie Generational Capital Partners, LLC (hereinafter collectively referred to as "Defendants") of the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101 *et. seq*.), the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO").[1]  As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff intends to amend his instant lawsuit to include claims under the PHRA and the PFPO once his administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission ("PHRC").

**JURISDICTION AND VENUE**

2. Plaintiff resides in and is a citizen of New Jersey.

3. Upon information and belief, Zahav Bioscience, LLC is incorporated under the laws of Delaware with headquarters and/or principal place of business in Pennsylvania, rendering it a citizen of Delaware and Pennsylvania.

4. Upon information and belief, Brodie Generational Capital Partners, LLC is incorporated under the laws of Delaware with headquarters and/or principal place of business in Pennsylvania, rendering it a citizen of Pennsylvania.

5. This Court, in accordance with 28 U.S.C. § 1332, has jurisdiction over Plaintiff's claims because there is complete diversity jurisdiction, as Plaintiff is a citizen of New Jersey, and Defendants are citizens of Delaware and Pennsylvania, and the amount in controversy exceeds $75,000.

6. This action is also being initiated pursuant to federal laws (the ADA) and therefore, the United States District Court for the Eastern District of Pennsylvania also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.  This Court has supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same circumstances and are based upon a common nucleus of operative fact.

7. This Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

8. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendants conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

9. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted his administrative proceedings before initiating this action by timely filing and dual-filing his Charge with the EEOC and PHRC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

## PARTIES

10. The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

11. Plaintiff is an adult who resides at the above-captioned address.

12. Brodie Generational Capital Partners, LLC (hereinafter individually referred to as "Defendant BGCP"), the parent corporation of Zahav Bioscience, LLC, is an investment corporation that accelerates and supports new ideas in the life sciences, cancer research, industrial an chemical sectors, and is headquartered at the above-captioned address.

13. Zahav Bioscience, LLC (hereinafter individually referred to as "Defendant Zahav"), a subsidiary of Defendant BGCP, is a biotechnology corporation specializing in medical research and the development of innovative drug therapies designed to target and eliminate cancerous tumors, with an address at the above-captioned address.

14. While Plaintiff's paystubs and W-4 form list Defendant Zahav as his employer, Plaintiff was *functionally and legally* an employee of both Defendants. By way of examples only:

   a. Defendants operate as a single enterprise;

3

    b. In or about September/October of 2023, Defendant BGCP purchased the assets of medical research company, Cytimmune Sciences, which was renamed as Zahav Bioscience, LLC, under the umbrella (subsidiary) of Brodie Generational Capital Partners, LLC. *See* https://delco.today/2023/12/brodie-generational-radnor/;

    c. A LexisNexis SmartLinx Comprehensive Business/Public Records Search lists Defendant Zahav as a subsidiary of parent corporation Defendant BGCP, with both entities headquartered at the same address – 150 N. Radnor Chester Road, Suite F1, Wayne, PA 19087 (this is the same address listed on Plaintiff's paystubs and W-2 form;

    d. The owners/operators of Defendant BGCP, were hands on and/or oversaw Defendant Zahav, requiring and/or being provided with detailed weekly reports, regularly monitoring and/or receiving presentations on how the drugs were manufactured, and overseeing operations and/or important personnel decisions, such as the firing of Defendant Zahav's CEO in or about the summer of 2024, and the hiring of its new President in or about August of 2024;

    e. The newly-hired President of Defendant Zahav informed Plaintiff that all hiring/firing, operational, and purchase/finance decisions had to be run by/justified to Defendant BGCP's management; and

    f. Defendants share resources, have the same owner(s) and/or high-level management, share financial controls, and merely operate as a single business under the aforesaid different business names.

15. Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership or financial controls, and other factors,

Defendants are sufficiently interrelated and integrated in their activities, labor relations, ownership, and management that they may be treated as a single and/or joint employer for purposes of the instant action.

16. At all times relevant herein, Defendants acted through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

17. The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

18. Defendant BGCP owns/operates companies in the industrial, healthcare, and life sciences industries, including Defendant Zahav, a biotechnology company.

19. Defendant BGCP purchased the assets of Defendant Zahav's predecessor, and then set up the newly named subsidiary at 1421 Race Street, Floor 15, Philadelphia, Pennsylvania 19102.

20. Defendant BGCP is owned/operated by Steven G. Brodie (hereinafter "SB") and Co-Presidents, Jacob Brodie (hereinafter "JB") and Howard Brodie (hereinafter "HB").

21. Plaintiff initially began working for Defendants as a "contract to hire," Senior Research Associate in or about January of 2024.

22. Thereafter, Plaintiff was hired as a full-time Scientist by Defendants on or about September 18, 2024.

23. Plaintiff was then promoted to another higher tier Scientist position in or about December of 2024 and held the same title until his unlawful termination (discussed further *infra*) on or about January 24, 2025.

24. Although management changed during Plaintiff's employment, at the time of his termination, he was primarily supervised by Chief Scientific Officer ("CSO"), Giulio Paciotti (hereinafter "Paciotti") and generally supervised by President, Linda Cherry (hereinafter "Cherry).

25. Plaintiff was originally generally supervised by former Chief Executive Officer ("CEO"), Saba Malak (hereinafter "Malak"), who was terminated by Defendant BGCP's management.

26. Cherry was then hired by Defendant BGCP's management in a newly formed President role to replace Malak, in or about August of 2024.

27. Cherry quickly informed Plaintiff that all hiring/firing, operational, and purchase/finance decisions had to be run by/justified to Defendant BGCP's management, SB, JB, and HB; and, in fact, Cherry, Paciotti, SB, and occasionally JB, met for dinner meetings approximately once a week to discuss operational needs, progress, and decision-making.

28. Throughout Plaintiff's employment with Defendants, Plaintiff was a hard-working employee and performed his job responsibilities in a dutiful and highly competent manner.

29. In fact, when Plaintiff initially started working for Defendants, he was instrumental in restarting the newly formed Defendant Zahav from the ground up, performing all manufacturing, instituting the new protocols, setting up analytical programs, and performing drug analysis.

30. Plaintiff was also initially tasked with training new employees and directly managing at least one.

31. As a result of Plaintiff's strong work ethic, dedication, and invaluable start-up contributions, Defendant Zahav's restart was successful, and Plaintiff was praised by Defendants' ownership/leadership.

32. Defendants' employees were also placed on a 120-day probationary period, which included a ninety (90) day review by Defendants' management.

33. Defendants' management, including but not limited to Paciotti, consistently assured Plaintiff that he was performing well and on track for future promotions (as demonstrated *supra* in Paragraphs 21-23), with Plaintiff's performance being more than satisfactory.

34. Plaintiff was also commended by SB, JB, and/or HB during frequent presentations and/or demonstrations for his knowledge and performance.

35. Additionally, at Plaintiff's ninety (90) day review, he was praised by Defendants' management including Paciotti, who stated that he was "vital to the company." In fact, only days prior to Plaintiff's termination, Paciotti specifically expressed that Plaintiff's "performance as a scientist has been exceptional," and that he "saw [Plaintiff] at the company for a long time."

36. Nonetheless, Plaintiff avers that he was subjected to discrimination, retaliation, and ultimately terminated by Defendants' management, as a result of his serious health conditions.

37. Plaintiff has and continues to suffer from ADA-qualifying disabilities, related to his mental health, including but not limited to anxiety and attention-deficit/hyperactivity disorder ("ADHD"), among other complications/conditions.

38. As a result of his aforesaid disabilities, Plaintiff sometimes suffers from anxiousness, panic, sleeplessness, and lack of focus, which (at times) limits his ability to perform some daily life activities, such as engaging in social interaction, sleeping, focusing, and working (when he experiences a flare-up of his health conditions).

39. Despite Plaintiff's aforesaid health conditions and limitations, he was able to perform the essential functions of his position; however, he (at times) required some reasonable medical accommodations (discussed further *infra*).

40. At or about the beginning of Plaintiff's employment with Defendants, he confided in Paciotti about the nature of his disabilities and requested a reasonable accommodation of a schedule modification to allow for treatment

41. Specifically, Plaintiff was working with his doctor to titrate his medications, which could affect his sleep patterns, and he required therapy sessions on Wednesday afternoons, for which he would leave an hour early – to which Paciotti readily agreed.

42. Thus, at all times relevant herein, Defendants' management including Paciotti were aware of his disabilities and treatment.

43. Furthermore, the majority of times Plaintiff was required to miss work to care for and treat his disabilities, he regularly made up the hours by working later after his therapy appointments (and did not have to use PTO, which was standard practice for Defendants' employees). Regardless, Plaintiff routinely worked 40+ hours each week throughout his tenure with Defendants.

44. Paciotti initially worked with Plaintiff and his requested accommodations. However, shortly after Cherry came aboard, Paciotti and Cherry began to exhibit frustration and hostility with Plaintiff's need for schedule modification, despite Plaintiff having apprised Paciotti that his medication titration had side effects impacting his daily life, including sleeping and focusing, which upon occasion required Plaintiff to request an altered arrival time to work.

45. Despite initially working with Plaintiff to accommodate his health conditions, after Cherry's arrival, Paciotti simply stated "we see you as a manger, you can't show up late," without properly engaging in any interactive process, as required under the ADA. Nonetheless, Plaintiff continued to perform his job duties well.

46. Then, *just two days* prior to Plaintiff's termination, on or about January 22, 2025, an order shipment arrived while Plaintiff was undergoing treatment for his disabilities (*i.e.*, a therapy appointment) – which Paciotti was fully aware of and for which Plaintiff had approval.

47. Due to his aforesaid January 22, 2025 therapy appointment, Plaintiff was not available to address the order, and Cherry, who was designated as Plaintiff's backup, was present and available at the time to handle and/or delegate the situation to another employee (Defendants' standard practice).

48. That same afternoon (January 22, 2025), during Plaintiff's subsequent weekly meeting with management, Cherry's demeanor toward Plaintiff noticeably shifted – as she met Plaintiff with a cold shoulder, in stark contrast to her previously civil communications.

49. In fact, on or about January 24, 2025, the day of his termination, Plaintiff spent the majority of his day working at his workstation – not far from Paciotti's office.

50. Following a routine morning meeting, Paciotti and Cherry spent most of the day in Paciotti's office, in a visibly heated discussion.

51. When Paciotti and Cherry exited Paciotti's office, Plaintiff overheard Paciotti flippantly exclaim, while speaking with Cherry (who appeared visibly angry), "I don't know, I don't go to therapy." Plaintiff avers that this was direct reference to his accommodation for weekly therapy sessions (including the January 22, 2025 therapy session), and that it was intended by Paciotti to dismiss Plaintiff's health conditions and minimize his need for accommodation.

52. Plaintiff was then abruptly terminated by Defendants' management, that same day, on or about January 24, 2025, for alleged performance concerns – a specific reference to Plaintiff's therapy appointment on or about January 22, 2025.

9

53. When Plaintiff asked for specific details regarding his purported performance concerns, Cherry responded with only vague reasoning – suggesting she was not updated on the status of Plaintiff's work and that Defendants' alleged reason for termination was completely pretextual.

54. Furthermore, Plaintiff was never given any counseling or notice prior to utilizing a reasonable accommodation on or about January 22, 2025, that his performance was considered a problem, nor was he offered any opportunity to improve or respond to these concerns before being abruptly terminated.

55. Plaintiff believes and therefore avers that from the beginning of his employment, when he apprised Defendants' management of his disabilities and his need for reasonable accommodations, he was subjected to heightened scrutiny and disparate treatment compared to his non-disabled counterparts.

56. While Plaintiff was prepared to obtain any doctors' notes requested of him or provide whatever supporting information would be needed for Defendants to properly engage in the interactive process under the ADA, Defendants did not ask for any further information and instead terminated Plaintiff's employment for discriminatory and retaliatory reasons.

57. Defendants failed to properly accommodate Plaintiff by terminating him for requesting and/or utilizing reasonable medical accommodations (*i.e.*, intermittent time off from work for therapy sessions and/or a modified schedule for medication titration).

58. Plaintiff believes and therefore avers that he was subjected to discrimination, a hostile work environment, and retaliation because of: (1) his actual/perceived/record of disabilities; (2) his requested medical accommodations; and (3) Defendants' failure to properly accommodate Plaintiff's disabilities (set forth *supra*).

59. Plaintiff also believes and therefore avers that his disabilities were motivating and/or determinative factors in the termination of his employment by Defendants.

## COUNT I
### Violations of the Americans with Disabilities Act, as Amended ("ADA")
([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment; and [4] Failure to Accommodate)
-Against Both Defendants-

60. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

61. Plaintiff suffered from qualifying health conditions under the ADA which affected his ability (at times) to perform some daily life activities.

62. Plaintiff kept Defendants' management informed of his serious medical conditions and need for medical treatment and other accommodations.

63. Despite Plaintiff's aforementioned health conditions and limitations, he was still able to perform the duties of his job well with Defendants; however, Plaintiff did require some reasonable medical accommodations at times.

64. Plaintiff requested reasonable accommodations from Defendants including but not limited to intermittent time off for therapy appointments, treatment, and a modified schedule due to medication titration.

65. Plaintiff was subjected to discrimination and a hostile work environment through disparate, demeaning and/or derogatory treatment/comments because of his aforesaid health conditions and requested accommodations.

66. Plaintiff was terminated from his employment with Defendants on or about January 24, 2025, *just two days* after requesting/utilizing reasonable medical accommodations.

67. Defendants failed to properly accommodate Plaintiff by terminating him for requesting and/or utilizing reasonable medical accommodations (*i.e.*, intermittent time off from work for therapy sessions and/or a modified schedule for medication titration).

68. Plaintiff believes and therefore avers that he was subjected to discrimination, a hostile work environment, and retaliation because of: (1) his actual/perceived/record of disabilities; (2) his requested medical accommodations; and (3) Defendants' failure to properly accommodate Plaintiff's disabilities (set forth *supra*).

69. Plaintiff also believes and therefore avers that his disabilities were motivating and/or determinative factors in the termination of his employment by Defendants.

70. These actions as aforesaid constitute violations of the ADA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.	Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.	Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.	Plaintiff demands trial by jury on all issues so triable consistent with Fed. R. Civ. P. 38(a)(1).

        Respectfully submitted,

        **KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
akarpf@karpf-law.com
(215) 639-0801

Dated: December 5, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Justen Scott Dowling | : | CIVIL ACTION |
| v. | : | |
| Zahav Bioscience, LLC, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (x)

| 12/5/2025 | [signature] | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: __Defendants place of business__

---

*RELATED CASE IF ANY:* Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit? Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☒ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☐ 15. Cases Seeking Systemic Relief *see certification below*
☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury (*Please specify*):_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
DOWLING, JUSTEN SCOTT

**(b)** County of Residence of First Listed Plaintiff: Hunterdon
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com

## DEFENDANTS
ZAHAV BIOSCIENCE, LLC, ET AL.

County of Residence of First Listed Defendant: Delaware
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION
[X] 3 Federal Question (U.S. Government Not a Party)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(For Diversity Cases Only)

## IV. NATURE OF SUIT
[X] 445 Amer. w/Disabilities - Employment

## V. ORIGIN
[X] 1 Original Proceeding

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing: ADA (42USC12101)
Brief description of cause: Violations of the ADA, PHRA and PFPO.

## VII. REQUESTED IN COMPLAINT:
JURY DEMAND: [X] Yes

## VIII. RELATED CASE(S) IF ANY

DATE: 12/5/2025
SIGNATURE OF ATTORNEY OF RECORD: [signature]

**FOR OFFICE USE ONLY**
RECEIPT #    AMOUNT    APPLYING IFP    JUDGE    MAG. JUDGE